IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 221 MEYER STREET, #13, ANCHORAGE, ALASKA | ) No: 320-mj-00245-dms ) ) ) ) ) |

### REVISED AFFIDAVIT IN SUPPORT OF
### AN APPLICATION UNDER RULE 41 FOR
### A WARRANT TO SEARCH AND SEIZE

Having been duly sworn, the undersigned affirms:

### Introduction

1. I submit this affidavit, in support of an application under Federal Rule of Criminal Procedure 41, for a warrant to search the premises known as 221 Meyer Street, #13, Anchorage, Alaska 99508, in the District of Alaska (the "Premises"), further described in Attachment A, for the things described in Attachment B. The Premises are the most recently known address of Mahmoud Ghassan SOUD ("SOUD"). There is probable cause to believe SOUD recently committed multiple violations of 18 U.S.C. § 922(g)(8). I submit that there is probable cause to believe that evidence, fruits, or contraband can be found within the Premises.

2. I am Special Agent Katherine Nelson of the Federal Bureau of Investigation ("FBI"). I began New Agent's Training in September 2018 and have been a Special Agent with the FBI since February 2019, when I completed training at Quantico, Virginia. Immediately following my graduation from New Agent's Training, I was



assigned to the Anchorage FBI Field Office on a Joint Terrorism Task Force (JTTF)/Domestic Terrorism squad. As an Agent I have been involved in the execution of search and arrest warrants, to include investigating violations of the illegal transfer and possession of firearms.

3. This affidavit is primarily for the purpose of establishing probable cause regarding a search warrant application, and, therefore, this affidavit does not recite all information known to me regarding this case.

**Probable Cause that Soud Violated 18 U.S.C. § 922(g)(8) on April 24, 2020**

4. Under 18 U.S.C. § 922(g)(8):

    It shall be unlawful for any person--... who is subject to a court order that--
    (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
    (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
    (C)(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury...
    To ... possess in or affecting commerce, any firearm ...

5. I reviewed the Domestic Violence Protective Order, in case number 3AN-20-00190CI, issued by State of Alaska Judge Polley on March 9, 2020 (the "DVPO"), in which SOUD is the respondent. Having reviewed the DVPO, I submit that it

qualifies as an order under 18 U.S.C. § 922(g)(8). The DVPO prohibited SOUD from committing or threatening to commit acts of domestic violence, stalking or harassment. The order is in effect indefinitely, until dissolved by court order. All other provisions of the order are in effect for one year and will expire on March 9, 2021. According to the DVPO, SOUD and his attorney, Rex Lamont Butler, were present in the courtroom for the hearing on March 9, 2020, in which the Court issued the DVPO. Page 6 of the DVPO includes this Notice:

5. If you possess a firearm or ammunition while this order is in effect, you may be charged with a federal offense even if paragraphs (D)(1)(k) and (D)(1)(l) of this order do not prohibit you from possessing these items. [18 USC 922(g)]

6. On or about April 24, 2020, in Anchorage, in the District of Alaska, SOUD was contacted by Anchorage Police Department when a vehicle (referred to below as the "Dakota") was stopped in a lane of traffic and SOUD was acting erratically and approaching other vehicles and appearing to argue with drivers. According to a police report, the following occurred, in which "I" is the first-person account of a police officer:

> When I first parked behind the Dakota, I observed SOUD was sitting in the middle of the intersection with Benson Blvd. SOUD stood up, started walking to me, pointed at the sky to the west, and told me to look at the sky. SOUD told me he loved us and then yelled at me "don't be doing this shit because I'm not going to hurt nobody," while taking off his coat. SOUD was acting frantic one moment, aggressive the next moment, and I believed based

on my observations SOUD'S actions would be unpredictable. I advised APD Dispatch I believed SOUD was under the influence of some kind of narcotic or having a mental health issue.

SOUD then grabbed his left jacket pocket with his right hand and told me he had a 9mm in his pocket. SOUD raised his hands in the air and told me to take the gun from him. I stepped back from SOUD and waited for additional patrols to arrive on scene before approaching SOUD. I could hear sirens approaching my location and I did not want to attempt to approach SOUD by myself based on his extremely erratic behavior. Throughout my time with SOUD, I continuously told him just relax and attempted to keep SOUD calm while keeping a safe distance. Ofc. MULVANEY arrived on scene, at which point I approached SOUD and secured a Smith & Wesson M&P 9 Shield from SOUD'S left front jacket pocket and placed it inside my patrol car.

After securing the firearm, SOUD walked back toward the Dakota while pointing at the sky and talking about the Quran.

7. Anchorage police identified the firearm possessed by SOUD as a Smith & Wesson MP9Shield, Serial #: HXE5063. On or about May 5, 2020, Special Agent Sarah Foreman of the Bureau of Alcohol, Tobacco, Firearms, and Explosives issued a Report of Investigation regarding that firearm, indicating that, based on research conducted, it is the researcher's opinion if the firearm was received and/or possessed in the State of Alaska, it had to have traveled in and affected interstate or foreign commerce as defined in Title 18 U.S.C. § 921(a)(2).

### Probable Cause that Soud Violated 18 U.S.C. § 922(g)(8) on April 30, 2020

8. According to APD reports and other evidence I am aware of, on April 30, 2020, SOUD violated the DVPO by going to residence of Torio, the petitioner in the DVPO.

9. Several officers wrote reports describing this incident in APD # 20-013469. One officer wrote:

On 4/30/2020 at about 1353 hours I was dispatched to [Torio's residence] for a reported disturbance. MAHMOUD SOUD was outside of JOSEPHINE TORIO's apartment yelling for JOSEPHINE to let him in, JOSEPHINE grabbed her [infant son] and [her sister] and left the apartment thought the opposite door. Fearing for their safety the three of them went to the laundry room of the apartment complex to hide and called APD, during this time MAHMOUD threw a rock threw the glass door to JOSEPHINE's apartment.

Neighbors saw MAHMOUD with a sword witnessed MAHMOUD throw the rock at the glass door. MAHMOUD then entered the apartment opening some doors and pulled some items out of the closets.

Upon arrival I observed the glass door to JOSEPHINE's apartment was broken and the door was partially open. I made announcements into the apartment, no one responded. Myself and other officers then entered the apartment to see if there was anyone inside. After clearing the apartment I went to the laundry room where JOSEPHINE had told 911 she was going to hide.

JOSEPHINE stated she heard a loud bang on the window she was sitting next to. JOSEPHINE then heard MAHMOUD yelling for her to let him in so he could see his son. JOSEPHINE immediately grabbed [her son] and sister

JACQUELINE and went out the other door to the apartment to hide in the laundry room. JOSEPHINE did not hear or see anything else. JOSEPHINE never saw MAHMOUD with a sword or any weapon. JOSEPHINE stated the glass door was closed when she left the apartment. When asked why she left the apartment she stated she was scared of what MAHMOUD would do to them. On a scale of 1-10, 1 being not scared at all to 10 being the most scared she has ever been JOSEPHINE rated her fear a 5. JOSEPHINE estimated the damage to the door would cost about $500 JOSEPHINE also stated she had a long term protective order against MAHMOUD (3AN-20-190CI)

10. Another officer wrote:

INVESTIGATION - The front glass door of [Torio's residence] had been shattered. The door was opened and a large rock was laying inside the residence. The suspects sword was bent and was laying on the ground outside in proximity to [the apartment]. The sheath of the sword was laying outside in the stairwell of the apartment just east of [the apartment]. Inside the apartment, it was determined that the suspect had searched for the complainant, as was evidenced by content of the kitchen pantry, such as an ironing board, were scattered upside down on the kitchen floor. The apartment was tidy and very clean. The complainants fresh food, still in two (2) large foam containers, were found abandoned on the coffee table, where the complainant had been eating at the time of the home invasion.

11. Another officer wrote:

I spoke with [a witness] who lives in the building. He heard yelling outside and went out to his deck. He said he heard someone screaming to open the door and thought it was the victim yelling. He later realized it was the suspect, MAHMOUD, yelling. He said MAHMOUD was also yelling about

aliens, and that he at one time had a sword in his hand. He saw MAHMOUD throw a rock at the door. [The witness] did not know MAHMOUD but was worried that he was going to hurt someone because of the way he acted.

12. Law enforcement recovered video from the witness and I have reviewed that video. As illustrated in the following excerpts from that video, it appears that SOUD possessed a rifle while at Torio's residence in violation of the DVPO, and that he drove away from Torio's residence in a truck that appears to match the description of a truck of which SOUD is the registered owner, *i.e.*, a 2002 Dodge Dakota pickup truck bearing Alaska license plate GNG508:



13. Based on all the information available to me, I believe that the long firearm SOUD possessed on April 30 is not the same firearm as a shotgun he possessed on May 3, 2020, as discussed below.



## Probable Cause that Evidence, Fruits, or Contraband are at Premises

14. Based on all the information available to me, I believe that the firearm SOUD possessed on April 30 (when he went to Torio's home) is not the same firearm as a shotgun he possessed on May 3, 2020, as discussed below. To summarize, SOUD appears to have recently possessed three firearms, only two of which have been found:

| Firearm | Possessed by Soud | Current Status |
|---|---|---|
| Handgun | April 24, 2020 (SOUD possessed in pocket prior to assault on police officers) | Seized |
| Rifle | April 30, 2020 (SOUD possessed within his coat in video depicting SOUD departing Torio's home) | At large |
| Shotgun | May 3, 2020 (SOUD threatened to shoot arresting officers at the Premises) | Seized |

15. Anchorage Police arrested the defendant on May 3, 2020, at the Premises. Describing that event in a report in APD # 20-013764, an officer wrote:

We arrived on scene and set up a perimeter around the apartment to try and make contact with SOUD. We knocked on the door and got no answer, then Officer BONAHOOM knocked on the door and announced that it was Anchorage Police and a male inside stated that if we went [through] the door he would start shooting. We backed away from the door and took cover while Officer BONAHOOM spoke to the male through a window. We confirmed that the male we were talking to was SOUD.

Officer BONAHOOM was able to convince SOUD to come out of the residence and he was placed into handcuffs. We entered the residence and found

a loaded shotgun in the living room. I took photographs of the residence and secured the firearm. I then took the firearm to APD to process it and placed it into APD Property and Evidence.

16. According to SOUD's mother, she does not possess any of SOUD's firearms. According to Torio, none of SOUD's firearms are in her residence. SOUD's landlord indicated that he is unaware of any firearms at the Premises.

17. SOUD's mother told law enforcement that SOUD lives at the Premises. According to SOUD's landlord, SOUD has lived at the Premises since approximately the time of the initial domestic violence protective order issued by a state court judge. Based on my review of that order, I know that date to be January 24, 2020. According to APSIN, SOUD lives at a different address. However, based on my review of a report in APD case # 20-013764, I believe that the Premises is the defendant's most recent home, because, among other information, police arrested him at that address following the incident on April 30, 2020.

18. By process of elimination, it seems reasonable to infer that the rifle SOUD possessed is at the Premises, because it has not yet been located by law enforcement in any other location associated with SOUD, including his mother's home or Torio's home. Under a separate search warrant number, I have applied to search SOUD's truck, but that search has not yet occurred.

19. Because the defendant typically lives alone at the Premises, and the defendant is currently ordered detained (per a hearing in *United States v. Soud*, 3:20-mj-00238-

DMS, occurring at approximately 1:30pm on May 8, 2020), execution of this search warrant is unlikely to disturb the peace of any other residents, person, or business, and, further, because the government is intending to secure the firearm as quickly as reasonably possible, I submit that there is reasonable cause to permit the search to occur at any time during the day or night.

20. Shortly after the hearing in *United States v. Soud*, 3:20-mj-00238-DMS, occurring at approximately 1:30pm on May 8, 2020, I learned of the FBI's initial Arabic-to-English translation of a phone call on or about May 7, 2020, in which SOUD spoke to another person, believed to be his mother. The initial translation indicates that SOUD said something to the effect of: ***hurry up, go to my apartment tonight or tomorrow, to get the rifle***. The defendant made some reference to ***woods*** or a ***forest***. The defendant made some reference to ***221***, which may refer to a caliber or type of rifle, or may refer to the defendant's apartment number. (By way of explanation, the bolded and italicized text is used to identify SOUD's words, which should not be considered a literal translation. An official translation has not yet been completed.)

21. Earlier today, I signed a prior version of this affidavit, which incorporated an initial translation of a phone call involving SOUD on or about May 7, 2020. After I signed that affidavit, I received another Arabic-to-English summary of the same phone call. This second translation may be more reliable than the first, because the second translation was prepared by a native speaker of Arabic, whereas the first was not.

The second translation is summarized as:

Mahmud calls his mom and tells her to go and check up on his apartment (on Meyer street) and stay there, there's food, milk, and lots of provisions. He tells her not to worry, he's innocent. It is not his shotgun, he found the shotgun in the forest while he was hiking. His mother asks if he is getting a lawyer and if they did an assessment on him, he tells her there's nothing wrong with him, and doesn't need a lawyer. He is happy where he is, as he is getting room and board, and does not want to pay $4,000 - $5,000 to get out. He tells her he doesn't mind being there 1,2,3,4 or even 5 months because he is innocent, and doesn't want to pay one cent to get out. He tells her to stop arguing with him as he has eyewitnesses that can prove what he's saying. He tells her that he didn't realize that he was on Federal property (Fort Richardson base) but that he found the shotgun in the forest. He tells her the shotgun is old and had water and mud covering it. He tells her that there were 2 eyewitnesses: One was a female service member (darker complexion) and the other was a federal police office (blue eyes, blond) . The cop took pictures of him and the shotgun and gave him a ride down the mountain. He tells his mom to tell Rick that the cop's name started with a "W". Mahmud asks his mom to put money ($50-$100) in his jail account and gives her his inmate number: 669-235. He tells her that he was beaten up when he was arrested, but has eyewitnesses. He tells her that the man who worked for "us" and who opened the door for her, is the one that turned him in. He tells her not to throw or clean anything up in his apartment, and to leave everything as is. He tells her not to worry, he is reading his Qur'an, saying his prayers, and that this is a battle with the devil, and that he's the Mehdi [Mihdi]. He tells her to say hello to everybody and for her not to worry about him.

//
//

Page 12 of 15
Search Warrant: 320-mj-00245-dms

Case 3:20-mj-00245-DMS   Document 1-1   Filed 05/08/20   Page 12 of 13

SOLEMNLY AFFIRMED UNDER PENALTY OF PERJURY on May 8, 2020, in Anchorage, Alaska.

_____
Katherine Nelson
Special Agent, FBI Anchorage

Subscribed and sworn telephonically on May 8, 2020.

Deborah Smith
Deborah Smith
US Magistrate Judge

Case 3:20-mj-00245-DMS   Document 1-1   Filed 05/08/20   Page 13 of 13